UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHAWN MURPHY,

                Plaintiff,

v.                                                                               Case No. 21-cv-52-pp

WISCONSIN DEPARTMENT OF CORRECTIONS,
WISCONSIN DIVISION OF COMMUNITY CORRECTIONS,
KENDRA HEEREY, and ROSEMARIE BARANEK,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), SCREENING COMPLAINT UNDER 28 U.S.C. §1915A AND DISMISSING CASE**

       Shawn Murphy, a person incarcerated at Waupun Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his right to due process before and during his probation revocation proceedings. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, and screens his complaint, dkt. no. 1.

**I.    Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

       The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was a prisoner when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA allows the court to let an incarcerated plaintiff proceed without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the incarcerated person must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his institution account. Id.

On January 13, 2021, the court ordered the plaintiff to pay an initial partial filing fee of $1.71. Dkt. No. 6. On February 22, 2021, the court granted the plaintiff's request to pay the initial partial filing fee from his release account. Dkt. No. 13. On March 1, 2021, the court granted his request to pay only $0.94—the balance of his release account—of the initial partial filing fee. Dkt. No. 15. The court received that reduced fee on March 16, 2021. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

## II.     Screening the Complaint

### A.     Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  The Plaintiff's Allegations

The plaintiff has sued the Wisconsin Department of Corrections (DOC), the Wisconsin Division of Community Corrections (DCC), Corrections Field Supervisor Kendra Heerey and Probation Agent Rosemarie Baranek. Dkt. No. 1 at 2. He alleges that Heerey and Baranek worked for the DOC at the time of the events described in the complaint. Id.

The complaint asserts that on July 8, 2013, the plaintiff was on probation from a 2000 state criminal conviction. Id. at 3. The plaintiff alleges that he went to St. Joseph's Hospital in West Bend, Wisconsin for crisis treatment because of mental health disorders, including obsessive-compulsive disorder, borderline personality disorder, antisocial personality disorder, a history of psychological trauma and pedophilic disorder. Id. Dr. Stephanie Post

3

(not a defendant) saw the plaintiff, put him on the "narcotic psychiatric" medication clonazepam, set up a "safety plan" and scheduled him for after-care with social worker Lori Landy (not a defendant). Id. at 4. The plaintiff says that he was to go to "acute crisis services" to find out about placement at Calm Harbor "safe house." Id. The plaintiff says that when he left St. Joseph's hospital, he'd been found not to be a danger to himself or others, but that when he got to the acute crisis services it was decided that Calm Harbor was not the proper placement for him. Id.

The plaintiff went home and called the St. Joseph's emergency room—he says it was the only thing he could think of—hoping to speak with Ms. Landy about some kind of placement. Id. Later that day, police came to the plaintiff's home and took him to Washington County Jail on a probation hold. Id. Some days later, the plaintiff's probation agent, defendant Baranek came to the jail to ask the plaintiff about behavior at his July 8, 2013 hospital visit "alleged to be violations of [his] rules of supervision." Id. at 4–5. The allegations were that the plaintiff "was verbally threatening, belligerent, profane, and engaged in controlling, harassing behavior towards St. Joseph's hospital workers on 7-8-2013." Id. at 5. The plaintiff says that he had no idea what Baranek was talking about and told her that nothing as she described had happened." Id. at 5. Eventually, the plaintiff was given revocation papers, but he refused to admit to the allegations about events at St. Joseph's Hospital on July 8, 2013; he says that "nothing happened." Id.

At the end of August 2013, the plaintiff received a DOC 1950 revocation summary. Id.; Dkt. No. 4 at 9. The form lists July 15, 2013 as the date Agent Baranek and Supervisory Heerley reviewed his case, and Baranek signed it on August 21, 2013. Dkt. No. 1 at 5; Dkt. No. 4 at 22. The form lists eight alleged

4

supervision violations and details the events giving rise to those violations. Dkt. No. 1 at 5; Dkt. No. 4 at 9. The form referenced events starting on November 11, 2012 and continuing through July 8, 2013, dkt. no. 4 at 9; the plaintiff says that violations 6, 7 and 8 were related to the mental health crisis that had started on July 7, 2013, dkt. no. 1 at 5-6. The plaintiff says that when he read the allegations in support of violations 7 and 8, he "could not believe what [he] was reading;" he says the events "never happened." Dkt. No. 1 at 6. He said, however, that he then read that a statement had been taken from "Jackie," a clinical supervisor with acute care services; the plaintiff believes that "Jackie" was Jacklyn Moglowsky, whom he knows to be a clinical supervisor at acute care services. Id.

The plaintiff says that no one "bothered" to ask him about Moglowsky, but that he and Moglowsky have a troubled history stretching back to the mid-1990s, before Moglowsky was an acute services supervisor and while she was a provider at Washington County Mental Health. Id. He alleges that because he did not give Moglowsky a release, and because it was found at St. Joseph's that he was not a danger to himself or others, contacting the "department"—presumably the police department—constituted a violation of HIPPA laws. Id. at 6-7. He asserts that he "repeatedly" told Baranek that nothing happened on July 8, 2013. Id. at 7.

On September 3, 2013, there was a revocation hearing on whether to revoke his probation. Id. at 7; Dkt. No. 4 at 23. The plaintiff says that the Department of Corrections had statements from three witnesses: Landy, Moglowsky and St. Joseph's ER nurse Ginger Knapp (not a defendant). Dkt. No. 1 at 7, 11. The plaintiff quotes large sections from ALJ Ishii's decision, which he provided in a 129-page packet of exhibits filed with his complaint. Id.

5

at 8–9; Dkt. No. 4 at 23. He says that ALJ Ishii found one of the alleged violations unsubstantiated by statements of Knapp and Landy, who testified that the plaintiff did not threaten them. Dkt. No. 1 at 8. Moglowsky did not testify, and the plaintiff speculates that it was because Moglowsky made hearsay statements to the DOC that were supposedly from Knapp and Landy but that conflicted with their statements. Id. at 9. ALJ Ishii also found that the plaintiff had called people "assholes," which constituted verbal abuse in violation of the rules of the plaintiff's supervision. Id. at 10. (The plaintiff appears to concede that he told Nurse Knapp that acute crisis services were assholes but asserts that there was no one from ACS at the hospital. Id.) The plaintiff asserts that ALJ Ishii decided to revoke the plaintiff's supervision based solely on the finding that calling someone an "asshole" constituted verbal abuse; the plaintiff asserts that "little weight" was given to that violation. Id.; Dkt. No. 4 at 24–29. The ALJ did not revoke the plaintiff's probation based on allegations seven and eight related to the incident on July 8, 2013. Dkt. No. 1 at 10; Dkt. No. 4 at 26–28.

On November 25, 2013, the plaintiff appeared for sentencing on the revocation before Washington County Circuit Court Judge Andrew T. Gonring, who also sentenced the plaintiff in his criminal case in 2000. Dkt. No. 1 at 12-13; Dkt. No. 4 at 31. The plaintiff says the revocation summary "was put befor[e] the sentencing court as accurate information in support of the sentence the Department wanted," even though Baranek knew that Knapp and Landy's testimony did not match the information in the revocation summary. Dkt. No. 1 at 12. The plaintiff asserts that Baranek's failure to correct the report's information violated his right to due process. Id. The plaintiff cites

portions of the sentencing transcript, which he included in his exhibits. Id. at 14; Dkt. No. 4 at 31.

Judge Gonring detailed the plaintiff's revocation history and behavior from his release on supervision on January 6, 2001, up to and after his visit to St. Joseph's hospital on July 8, 2013. Dkt. No. 4 at 71–85. Judge Gonring found that the plaintiff had made "odd and veiled threats to personnel at St. Joe's Hospital," "demanded to be placed at Calm Harbor" and waited in the parking lot of the hospital after he was denied that placement. Dkt. No. 1 at 14; Dkt. No. 4 at 83. The plaintiff then repeatedly called the hospital to speak with "this particular nurse," referring to Knapp. Dkt. No. 1 at 15; Dkt. No. 4 at 83. Judge Gonring noted that when the plaintiff reported to the hospital on July 8, 2013, he was out past his curfew and had been "walking the streets and [was] angry." Dkt. No. 1 at 15; Dkt. No. 4 at 84. Judge Gonring imposed a twenty-year sentence—twelve years' imprisonment followed by eight years' extended supervision. Dkt. No. 4 at 94.

The plaintiff contests Judge Gonring's decision. He asserts there are no witness statements in the revocation summary about the plaintiff's actions before he reported to the hospital. Dkt. No. 1 at 16. He argues that Knapp and Landy's testimony at the hearing did not support allegations 7 and 8. Id. at 16-17. He argues that because of his mental health status, he could not help himself and that there was no one to help him. Id. at 17. The plaintiff asserts that Judge Gonring's reliance on the information in the report—information he insists was inaccurate—violated his right to due process. Id. The plaintiff also asserts that Judge Gonring "put aside facts of [his] character put forward by [his] attorney," relying instead on unproven allegations. Id. at 18. The plaintiff alleges Judge Gonring credited the state's evidence, even though its own

7

witnesses knew that the events described in the revocation report did not occur. Id. The plaintiff asserts "the Department tr[i]ed (did) to make the information more grievous to increase [his] sentence." Id. at 21.

The plaintiff filed a notice of intent to seek postconviction relief, and the court appointed the State Public Defender's office to represent him. Dkt. No. 4 at 97. That attorney filed a no merit brief with the Wisconsin Court of Appeals. Id. at 96. The plaintiff filed a response to counsel's brief, contending that Judge Gonring "did not sentence [him] on the facts of the record." Id. at 111. On March 11, 2015, the Court of Appeals concluded that "[t]here is no merit to a claim that [the plaintiff] was sentenced upon inaccurate information" and affirmed the plaintiff's conviction and sentence. Id. at 128. In his §1983 complaint, the plaintiff asserts that the Court of Appeals accepted "the inaccurate information fed to the sentencing court by the defendants." Dkt. No. 1 at 21–22. He does not say whether he appealed the Court of Appeals' decision to the Wisconsin Supreme Court, but the public docket shows that he did not; he filed a motion to reconsider, which the Court of Appeals denied. State v. Murphy, Appeal No. 2014AP2237 (available at https://wscca.wicourts.gov).

The plaintiff seeks declaratory judgment "to show respons[i]bility for harm done by violation of 'due process' which increase my sentence illegally." Id. at 24. He also wants monetary damages totaling $2.5 million. Id.

    C.    Analysis

        1.    *Timeliness*

The plaintiff seeks to proceed on claims that the defendants violated his right to due process before and during his 2013 revocation proceedings and appeal. The statute of limitations for civil rights lawsuits brought under §1983 is "the statute of limitations for personal injuries supplied by the state in which

the claim arose." Huber v. Anderson, 909 F.3d 201, 207 (7th Cir. 2018) (citing Wallace v. Kato, 549 U.S. 384, 387 (2007)). In Wisconsin, the limitation period for §1983 cases is the three-year period in Wis. Stat. §893.54 (2018). Before 2018, however, the limitation period for such cases was six years. See Huber, 909 F.3d at 207 (citing 2017 Wis. Act 235 (eff. Apr. 5, 2018)) (reducing applicable statute of limitations from six to three years). The plaintiff's claims accrued in 2013, when the alleged violations were "complete," and the plaintiff could "file suit and obtain relief." Bey v. Hamblin, No. 17-cv-784-JDP, 2018 WL 3075834, at *2 (W.D. Wis. June 21, 2018) (quoting Wallace, 549 U.S. at 388). That means he gets the benefit of the longer, six-year limitation period.

The plaintiff's revocation hearing occurred on September 3, 2013, ALJ Ishii entered her decision revoking his supervision on September 6, 2013 and Judge Gonring sentenced the plaintiff on November 25, 2013. That means the latest he could have challenged the alleged violations of his constitutional rights that occurred before and during these proceedings was November 25, 2019. The plaintiff filed the federal complaint on January 13, 2021—over a year too late.

The plaintiff apparently realizes that his complaint was untimely; at the end of the complaint, he says,

> --State of Limitations—I am not certain how certain things play part to the statute of limitations, i.e.:
>
> A    Harm on going.
> B    Equitably Tolled: Ramirez v. Yates, 471 F.3d 993, 998.
> C    Violation of my right to meaningful court access by Department of Corrections "Due Process" right to be heard.
> D    Violation of rights under A.D.A. 42 U.S.C. §12131.

Dkt. No. 1 at 23.

9

Case 2:21-cv-00052-PP   Filed 04/20/21   Page 9 of 16   Document 16

By "harm on going," the court assumes the plaintiff means to refer to the continuing violation doctrine. Under the continuing violation doctrine, the statute of limitations may be tolled for "claims necessarily comprised of a string of connected wrongful acts that, though beginning outside the limitations period, ends within the period (like hostile work environment claims)." Olrich v. Kenosha Cty., 825 F. App'x 397, 399 (7th Cir. 2020) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-17 (2002)). The continuing violation doctrine "is better understood as three distinct doctrines"—"(1) the genuine continuing violation doctrine, (2) the cumulative violation doctrine, and (3) the continuing injury doctrine." Bernard v. Scott, No. 3:15-cv-50277, 2020 WL 6825696, at *5 (N.D. Ill. Nov. 20, 2020) (citing Turley v. Rednour, 729 F.3d 645, 654 (7th Cir. 2013) (Easterbrook, J., concurring)).

A genuine continuing violation occurs "when the defendant commits discrete but repeated violations." Id. at *6 (citing Turley, 729 F.3d at 654). A cumulative violation "is based on injuries that accrue over time," "once the harm accumulates enough to create a claim." Id. Continuing injuries "are those in which 'a discrete wrongful act causes continuing harm.'" Id. The first category—a genuine continuing violation—applies both when there is a series of acts and the plaintiff cannot reasonably be expected to file suit for each independent violation," id. (quoting Selan v. Kiley, 969 F.2d 560, 565-66 (7th Cir. 1992), and "when the 'state actor has a policy or practice that brings with it a fresh violation each day,'" id. (quoting Woody v. City of Granite City, No. 17-CV-534-SMY-RJD, 2019 WL 1326884, at *4 (S.D. Ill. Mar. 25, 2019), and citing Reese v. Ice Cream Specialties, Inc., 347 F.3d 1007, 1012-14 (7th Cir. 2003)).

10

The plaintiff has alleged that the defendants violated his due process rights by allegedly providing false information that caused him to be revoked and sentenced to prison. He has not alleged that the defendants committed repeated acts that accrued over time or continued to violate his rights after he was sentenced. Once the plaintiff was revoked and sentenced based on the allegedly false information the defendants included in the revocation summary, their alleged violations of his constitutional rights were complete and the plaintiff was aware that he had a cause of action. The plaintiff has not alleged a continuing violation sufficient to toll the statute of limitations.

The plaintiff next mentions equitable tolling, citing "Ramirez v. Yates, 471 F.3d 993, 998." Dkt. No. 1 at 23. Ramirez v. Yates, 571 F.3d 993 (9th Cir. 2009) is a 2009 decision from the Ninth Circuit Court of Appeals and is not binding on this court. Even if it was binding on this court, that opinion involves an appeal from the denial of a *habeas corpus* petition filed under 28 U.S.C. §2254. Id. at 995. The section the plaintiff cites discusses tolling the limitation period for an incarcerated person whose "lack of knowledge that the state courts have reached a final resolution of his case can provide grounds for equitable tolling if the prisoner has acted diligently in the matter." Id. at 997 (quotation omitted). The plaintiff does not explain how that ground for tolling applies to him and this lawsuit. The plaintiff filed a civil rights case under §1983, not a petition for *habeas* relief under §2254. His own exhibits show that he was aware that his conviction was final and that he had a right to appeal—he filed a response to his attorney's no-merit brief. He does not allege that he was unaware of the Court of Appeals' decision affirming his conviction and sentence. The plaintiff has not presented a viable ground for equitable tolling.

The plaintiff next asserts that he was denied "meaningful court access by Department of Corrections 'due process' right to heared [sic]." Dkt. No. 1 at 23. Elsewhere the complaint alleges that the plaintiff was denied "accommodations for meaningful/equal access to prisons law library." Id. at 17. The plaintiff says he was not provided this accommodation until September 12, 2018, "which in the end became unmeaningful!" Id. He alleges that it was only recently that he had "been able to put these facts to paper." Id. at 22.

It appears that the plaintiff is arguing that he was denied access to the law library, which prevented him from timely preparing and filing this lawsuit. The problem with that argument is that the plaintiff filed three other lawsuits between 2016 and 2018, and one in 2020, all while he was incarcerated at Waupun. See Case Nos. 16-cv-438-JPS (complaint received April 7, 2016); 16-cv-1462-PP (complaint received Nov. 1, 2016); 18-cv-584-PP (complaint received Apr. 13, 2018); 20-cv-22-PP (complaint received Jan. 6, 2020). The plaintiff had until at least September 2019 (and as late as November 2019) to file this lawsuit but failed to do so. Yet before that deadline, he filed three other lawsuits and litigated them, two of them before this court. He then filed a fourth lawsuit in 2020, before bringing this suit in early 2021. The plaintiff has not explained why he was able to file four lawsuits during the same period he should have brought this one but somehow was prevented from filing this lawsuit until January 2021—over a year past the filing deadline.

Finally, the plaintiff asserts "violation of rights under A.D.A. 42 USC §12131." Dkt. No. 1 at 23. That statute provides definitions for terms relevant to laws prohibiting discrimination in public services. The plaintiff does not explain how these definitions apply to him. He does not explain what disability he has that was not accommodated (although the court infers is it is mental

12

health diagnoses), how it was not accommodated or by whom or how not having that accommodation made him unable to timely file this lawsuit (but did not prevent him from filing his previous four lawsuits).

The plaintiff also asserts that he has had limited access to the prison's law library because of the ongoing COVID-19 pandemic. Dkt. No. 1 at 22. But the court has explained that the plaintiff's deadline to bring this lawsuit was November 2019 at the latest—several months *before* the pandemic began. See https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (showing that the World Health Organization characterized COVID-19 as a pandemic on March 11, 2020). Whether the plaintiff was unable to prepare his complaint months later during the pandemic is irrelevant; by then, it already was too late.

The court must dismiss his complaint because it is untimely.

2. *Merits*

Even if the plaintiff had timely filed his complaint, it would fail to state a claim. The plaintiff seeks to challenge his revocation proceedings, his resulting sentence and the Wisconsin Court of Appeals' decision affirming the revocation and sentence. But a person incarcerated in a state facility as a result of a criminal conviction may not bring a §1983 lawsuit in federal court for damages or equitable relief "*if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." Wilkinson v. Dotson, 544 U.S. 74, 81–82 (2005) (emphasis in original). The incarcerated person first must demonstrate that a court has reversed, expunged, declared invalid or otherwise set aside the conviction or sentence he wants to challenge. See Heck v. Humphrey, 512 U.S. 477, 486–87 (1994).

The plaintiff appealed his revocation and sentence, but the Court of Appeals affirmed both. He does not say whether he sought review in the Wisconsin Supreme Court but the public docket shows that he did not. Nor does the plaintiff indicate whether he has challenged his revocation or sentence in a petition under §2254. The court cannot find a record showing he did that, either. Unless and until the plaintiff shows that his revocation and sentence have been invalidated or expunged, he may not bring a complaint under §1983 seeking damages or equitable relief from conduct that allegedly occurred during those proceedings.

To the extent the plaintiff seeks to challenge the Court of Appeals decision affirming his revocation and sentence, he may not do so. The proper way for the plaintiff to have appealed that decision was to file a petition for review with the Wisconsin Supreme Court. See Wis. Stat. §§808.10, 809.62(1m)(a). If the Supreme Court had not granted review, or had granted review but affirmed, he could have filed a petition for *habeas corpus* in this district under §2254. See Heck, 512 U.S. at 481 (citing Preiser v. Rodriguez, 411 U.S. 475, 488–90 (1973)) ("[H]abeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement . . . even though such a claim may come within the literal terms of § 1983."). The plaintiff cannot bring a lawsuit under §1983 to challenge his revocation, his sentence or the Court of Appeals' decision.

### III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE** because it is untimely and because the complaint fails to state a claim for

14

Case 2:21-cv-00052-PP   Filed 04/20/21   Page 14 of 16   Document 16

which a federal court may grant relief. The clerk will enter judgment accordingly.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$349.06** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Waupun Correctional Institution.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Fed. R. of App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed

15

Case 2:21-cv-00052-PP   Filed 04/20/21   Page 15 of 16   Document 16

within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 20th day of April, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**